We'll hear argument next in Republic of Turkey v. Christie's Inc. 21-2485. Thank you so much, George. Thank you. Good morning. May it please the court, I am Lawrence Kay, partner of Herod Feinstein, attorneys for the repellent, the Republic of Turkey. I reserve two minutes for rebuttal. This is an appeal from the judgment below that rejected the Republic's claim to recover a nearly completely intact 6,000-year-old Kilya idol, a Turkish patrimonial treasure. The Republic's appeal is based on the district court's failure to follow well-established and controlled New York law on both the issues of proof of ownership and of latches. Counsel, are you prepared to tell us that the district court abused her discretion in reaching her findings? Because otherwise, we assume that she got it correctly, unless she abused her discretion, correct? I believe she abused her discretion, and I believe that the district court simply did not follow New York law. Its decision is contrary to New York law, and New York law governs the issues involved in this case. The controlling New York law is- New York law, as I understand it, says that a plaintiff must make a threshold showing of an arguable claim. Is that right? Yes, correct. What does that mean? I'm having some trouble figuring out what that means. It means that the plaintiff is required to submit evidence that a reasonable juror- from which a reasonable juror can infer that it has ownership of the stolen property. And the burden will then shift upon that threshold showing, that threshold showing, to the defendant to prove that the object in question in this case was actually stolen. What was the showing here? The showing here was substantial, Your Honor, based on circumstantial evidence laid out in our brief in pages 27- Excuse me, counsel. The district court found that Turkey was aware of the existence of this idol from the 1990s. That's the basis of the Latches holding. Is that correct? That is the basis of the Latches decision, Your Honor, in court. Or were you not aware in the 90s? Your Honor, the record shows that at some point in the 90s, it was known that there was a Kill Your Idol in New York in something called the Gwendoll Collection. And that was all that was known. It may have been known that it was Anatolian as well. Why didn't that trigger Turkey's responsibility to seek ownership then? Because, Your Honor, Turkey has literally tens of thousands of antiquities, including Anatolian antiquities, that are spread throughout the world. That Turkey has a statute called the Decree on Antiquities that was adopted in 1906 for the first time, vested title in all undiscovered antiquities in Turkey. Does Turkey contend that the finding that Turkey was aware in the 1990s of the idol at the Met was clearly erroneous? Turkey was aware of the idol. It was not necessarily aware that it was at the Metropolitan Museum of Art, because what they knew was that it was in something called the Gwendoll Collection. So let me refine the question. Assuming that Turkey, the Republic, was aware of this particular idol prior to 2017, right, didn't the Republic have an obligation to at least investigate, understanding what you just said about the fact that there are thousands of similar artifacts, but at least investigate the origins and ownership of this particular idol? Well, I think, Your Honor, it would be extraordinarily burdensome for Turkey to have to investigate every idol. With respect to this idol, as the briefs made clear, the ownership in Turkey of this idol depends on whether it was excavated in and removed from Turkey before or after 1906. Correct, because that's when the Decree on Antiquities was adopted. But if you would answer my question, you know about the idol. Your Honor, without knowing the provenance of any particular antiquity, there's no way for Turkey to know. Why didn't they inquire about the provenance? Your Honor, there is, in addition to the burdensome aspect, there is no case in the State of New York, and indeed the guiding case of Guggenheim, the Rubel, which sets forth all these rules, makes it crystal clear that there's no obligation on the part of an owner to investigate or make inquiry with respect to the possibility that it has a stolen object. Who knows that it was stolen? What changed in 2017? In 2017, what changed is the idol was put up for auction at Christie's Auction House. And for the first time, for the first time ever, it was indicated that there was no provenance whatsoever for this idol prior to the time it was sold by a documented trafficker in Turkish antiquities to a collector in New York, Alastair Martin. Nothing. It was only at that time, based on our circumstantial evidence showing, Your Honor, that Turkey was able to... So that and that alone, that information and that alone, in your view, is the information that the Republic would have needed to know before it had a duty to inquire? Exactly, Your Honor. Because until then, there was nothing known about the provenance of this object, where it had been, whether it came out of Turkey before or after 1906. But once Turkey learned, there was no provenance. Is this argument, well, maybe you've already answered this. Is this argument unique to a nation state, or is it for any owner? For any owner. In New York, in all the annals of New York law, no owner has been required to make inquiry of any object that he didn't know was stolen. The Guggenheim case is a case in point. That was a museum, and they had it in their collection. They weren't sure where it was, so they weren't sure it was stolen. And they had no obligation to make inquiry or to conduct an investigation before they finally did an inventory and learned that it was gone. That's fundamental law in the state of New York. Not only not requiring an obligation to inquire, but eschewing that obligation on the part of the victimized owner. And all of this is consistent with New York law. As Judge Wyman recently stated in Howard University against Borders, placing the high burden on the current professor is in line with the underlying policy interest of New York law. Which has long protected the right of the owner to recover its property. I think that might have been stated in the context of ownership, as opposed to laches. It seems to me the concept of laches, if someone knew or should have known of a possible claim, and then doesn't do anything, but sits on his or her rights, and there's prejudice to the other side, then it's too bad. Again, I apologize for repeating myself, but the Republic could not know whether this came out before 1906 or after 1906, till it learned that there was no provenance before 1906. It learned shortly after it filed suit that the seller of the property was Mr. Kleshman, who later was found to have sold 358... If Turkey had inquired along the way, then it would have been told that there is no provenance. I'm not sure that's true, Your Honor. In the cases generally, there's very little information that flows from that. There's no evidence they knew it was at the Metropolitan. But what did Turkey know in the 90s? All they learned in the 90s was that there had been looting at a site called Galak Bazaar, where these idols were manufactured. It learned that there were some idols scattered throughout the world, including in the Gwinnell Collection. But they had no idea that it was at the Metropolitan. The record shows that. And they had no idea what the history of provenance of the idol was, until they learned that there was no provenance at all, that it appeared mysteriously out of nowhere, sold by J.J. Kleshman, who was also the seller of over 300 stolen Lydian antiquities to the Metropolitan Museum of Art, on which Defendant Steinhardt sat on a board and knew about, before he bought it, knew about the Lydian art case. Am I right that in the appendix, in the record, that there was at least one person associated with the Turkish government who had written about this particular idol, that the Anatolian origins of this particular idol, as part of that collection, was the subject of literature, a number of different academic pieces of writing, and that well prior to 2017, maybe not the provenance in the way that you described it, but the fact that this idol was likely from modern day Turkey, consistent with the decree, had been discussed and was widely known, and, just to go back to my original point, had been written about by a person who was associated with the Turkish government in Turkey. Is that correct? As I said, the people in Turkey only knew that there was an Anatolian idol in New York, not necessarily at the Metropolitan Museum, and certainly not with Mr. Steinhardt. That's all they knew. And that, under New York law, is not sufficient to require the victimized owner to make an investigation. So you're saying that they had to know that it was potentially stolen? They had to know that either it came out of Turkey before 1906, when the decree on antiquities was adopted, or excavated somewhere else in the world. What if there was a question? I'm sorry? What if there were a real question about the 1906 date, for example?  No, Your Honor. Under this particular statute, the knowledge of whether it came out before or after 1906, the knowledge of the provenance, the knowledge that it was sold by someone who also sold stolen antiquities to the Metropolitan, all of that information would be necessary before any obligation on Turkey to investigate this tribute. If you look at the Guggenheim decision, it creates a balance between the diligence of the owner and the vigilance of the defendant. We believe that in this particular case, Turkey did not inexcusably delay. We also argue that the Guggenheim rule clearly set forth an obligation on the part of the possessor to investigate the ownership of an object that's bought. And that obligation, particularly whereas here, as in Guggenheim, red flags are present, is a very heavy obligation. And the court in this case, again, in contravention of New York law, relieved Defendant Steinhardt of that obligation. And we believe there's nothing in the record to show that any of the elements of latches, even if Turkey had an excuse to delay, which we believe it did not, that even if it had, none of the elements of latches are proved in the record here. There's nothing in the record to show actual prejudice. We've explained in our briefs why nothing that was argued by defendants rises to the level of prejudice. Thank you. I'm sorry, Judge. I did have a question. Wasn't it generally known in 1961 that the idol was sold to Alistair and Edith Martin? Wasn't that generally known? No, Your Honor. There's nothing in the record that says it was generally known. And responding to the earlier question about publications, if you look in the record, the publications were all very brief in many periodicals and journals that were not generally known, and there is no evidence in the record that the Republic of Turkey or anyone acting on behalf of the Republic of Turkey knew about any of those publications. And, again, all they would have indicated is there was an Anatolian piece. Weren't you keeping an eye on J.J. Kretschmann, who you say was a known looter of antiquities? Didn't you know what he did? I'm sorry, Your Honor. He's the one that sold it to the Martins. I'm sorry. Can you repeat that, Your Honor? Weren't you keeping an eye on what he was doing since he was a known looter? There's no way to keep an eye on every dealer in the world that deals in looted Turkish antiquities, and there was no way. Turkey wasn't published. There's no way Turkey could have known indeed. Turkey didn't find out that the seller was J.J. Kretschmann until after it started suit and finally got information from Christie's Auction House that J.J. Kretschmann had been the seller. There was no way to know that. All right. We'll hear from your friends on the other side, and then we'll hear again from you on rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Eden Burgess. I'm appearing here today on behalf of defendants at police, Christie's, Inc., and Michael Steinhardt. After an eight-day bench trial involving 13 fact and four expert witnesses, close to 300 exhibits, and ending in a decisive ruling, a decisive fact-intensive ruling in Appley's favor, Turkey now comes before this Court requesting reversal of that ruling. The voluminous evidentiary presentations by both sides were carefully weighed and considered. I wonder whether the district court applied the wrong standard. I mean, it held Turkey to a preponderance standard and doesn't use the threshold showing of an arguable claim language? Well, Your Honor, what the Court did was apply rules of standards for replevin and conversion that have been in place in New York forever with respect to having to first establish. And those rules, including as set forth by our court, are that the plaintiff makes a threshold showing of an arguable claim. And if it does, then the burden of proof shifts to the current possessor. Yes. And I don't think Judge Nathan acknowledged that. Is that an accurate statement of the law, first of all? It is, Your Honor. And did Judge Nathan even acknowledge that that was the law? Yes, I believe she did. Particularly, Your Honor, she wrote a very, I find, useful opinion. She says the Republic must demonstrate an ownership interest by a preponderance of the evidence. Yes. So why isn't that error? Well, Your Honor, as I was explaining, the replevin and conversion case law that goes back for decades in this Court require that the claimant establish it has a superior right to possession and ownership. And in her state opinion that was issued after her opinion after the trial, Turkey had moved for a post-judgment stay, she says that Turkey is trying to lessen its burden by pointing out words like arguable thresholds and things of that nature. And she says that initial burden is still a burden. And without sufficient evidence, Turkey was not able to establish its ownership. Counsel, when did the burden on Turkey arise? When should they have known to inquire? What is your argument? With respect to latches? Yes. I'm not talking about latches. I'm talking about the burden to prove ownership or to inquire further. When did that arise with this item? Well, Your Honor, I think those are maybe in two different contexts, one in ownership and one in latches. Well, there's a 61, an 80, a 90. When was Turkey obligated to inquire further? Sometime before the sale at Christie's? Yes, sir. When they saw this? Sometime before this, the burden on Turkey arose. When was that by your estimation? Well, Your Honor, what we argued at trial and what the district court accepted was that at the latest, it was in the early 90s, as you pointed out, because the Turkish Ministry of Culture itself had published information about this idol. There was no question that they knew where it was. It was referred to as the Gwinal Idol. The district court found that the Gwinal was a renowned collection in New York. And at the absolute latest, it had to make a claim in the early 1990s. At least from the 90s, Turkey was under some obligation to show ownership, to prove ownership. Yes, Your Honor, absolutely. Does the fact that the claimant here is a foreign sovereign, a nation, impact this analysis at all under New York law? No, Your Honor. We're not aware of any case that lessens the burden on a foreign sovereign with respect to ownership or latches or any of the elements that have come up in this decision. So Turkey's status as a foreign sovereign should not affect the analysis. And just to pick up on Mr. Kaye's argument, does the republic, does Turkey have to investigate any Anatolian idol or idol that might have Anatolian origins of the thousands, as I understand, that exist, of which it's aware to avoid a potential future latches defense under New York law? Your Honor, the district court considered that argument and rejected it. And I would echo that view, which is on the facts of this case, which are an egregious example of a latches. But I've got a separate, I've got a different question. My question is, does the republic have to investigate any Anatolian idol? No, Your Honor. So under which circumstances would it not have to investigate an idol of which it's aware may have Anatolian origins? Well, Your Honor, that's difficult to voice without knowing exact circumstances. You answered no to my question. So what circumstances? Well, for example, if this idol had never been published, was not a well-known example that was known to experts, even as undergrads studying archaeology, if this idol had sat in a private person's attic for 50 years and had never been on view to the public, had never been studied, had never been published, in particular by Turkey itself, under those kinds of circumstances, it's possible that Turkey could legitimately argue against that allegation. So you're asking us to place a great deal of weight on the fact that this particular idol was known by the Ministry of Culture in Turkey? Yes, I think. And that's really the big fact here. That is the big fact. With respect to the latches offense. Yes, Your Honor, and the district court acknowledged that in her opinion. They knew about this particular idol, the Ministry of Culture? Yes. But weren't there two idols around? Was there another one? There was another one. This one, my colleague said that they were not aware that it was at the Met, but the Met did publish a catalog. It was on display from the 60s for about 25 years. So I disagree that the record reflects that Turkey didn't know that it was at the Met. I think that, in fact, it does. Your colleague on the other side also says that no case has ever held that an owner is required to make inquiry. Is that true? Is there any case that has so held? Well, Your Honor, that's a statute of limitations context argument, which is not an issue here. And I believe what my colleague is referring to is the shifting of the burden under the ownership context. What about in the latches case? Any cases holding that there is an obligation to make inquiry? Well, Your Honor, the Lubell and other cases do require that the diligence of both parties be balanced. So there is some indication that if you are a party with a claim and you've shown absolutely no diligence, as Turkey did here, as opposed to Mr. Steinhardt, who testified in great detail as to his diligence, that weighing step is going to weigh against you. And, you know, I start off by asking about the threshold showing of an arguable claim. The district court didn't engage in that analysis, right? And if the answer is yes, there is a threshold showing, then the burden shifts to the defendants. And so I'm troubled by the absence of that analysis and whether if there were enough to make a threshold showing of an arguable claim, whether the burden would shift. Well, what I would say, Your Honor, as I mentioned, and I think she addresses that in her stay opinion in some detail. Yeah, I've looked at it. I'm not sure she does. Okay. So I would say in her initial opinion, what she lays out is that Turkey has really no evidence whatsoever. The only fact that she could find with respect to the idol's origins or path was that it was. It would have been helpful if she had said the threshold showing has not been made, but, you know, we don't know what her thinking. And they articulate some facts that they claim circumstantially show, but. They do, Your Honor, but under the abusive discretion standard, the court did consider all of those allegations. It would be an abusive discretion if she didn't apply the correct standard, right? Yes, but I do believe, of course, that she did apply the right standard. She did consider all the facts that Turkey has raised in its appellate briefs. She did not accept the testimony of their expert. Maybe a response, but maybe not, is that you would say that, in fact, given the record before us, the Republic also failed to make a threshold showing of an arguable claim. Yes, agreed, Your Honor, which is the reason that the stay opinion is useful, because she's more explicit about laying out Turkey's argument on the burden, and she says an initial burden is still a burden. Yes. Let me put it another way. Do you win even if we don't rely on latches? If you don't rely on latches, Your Honor, or on this ownership issue? If we don't rely on latches as the reason, do you win because Turkey didn't prove ownership? Yes. And the burden never shifted? Yes. The court could affirm on ownership and latches or on one or the other, and the outcome would be the same in favor of the defendant at police. You know, it just strikes – I would just say this. It strikes me as a little strange that the fact that it's a nation that is the – who is the purported owner or has potential ownership interests, the fact that it's a sovereign nation is not part of the analysis. And you tell me that there's nothing in New York law that suggests that we should treat – and actually, ironically, I think your friend also tells me that there's nothing in New York law that tells me that we should treat a sovereign differently. That's our view, Your Honor. We're not aware of any case law, in particular in this context, that would distinguish a foreign sovereign claimant from any other kind of claimant. And this is Turkey's own – Has that ever come up? In other words, has that ever come up to the New York Court of Appeals? I don't – This issue of – I'm not aware of any case that specifically raises that issue. Of course, my colleagues do raise the burden on Turkey and things of that nature. Of course. But that specific question has not been addressed. And, you know, it is Turkey's own patrimony law that they are trying to enforce as well in this case, which is an interesting thing to keep in mind. But you are not arguing about the enforceability of the 1906 rule? No. No, Your Honor. So you agree that it's an enforceable ownership law? We've accepted the district court's ruling on that issue, yes. Thank you. Thank you. Mr. Kaye. I'd like to say, in respect to the question of the sovereign being the plaintiff, that it is relevant because the way the district court's decision goes, no sovereign nation would ever be able to recover its stolen patrimony under the rulings of the decision below. Well, that's not quite the argument. But, you know, here there's a unique fact, which is that the, unless you tell me that it's wrong, which is that the Turkish Ministry of Culture was aware of this idol and aware of its potential Anatolian origins. And as I understood your brief or briefing, that's a telltale sign that an idol, separate and apart, I think, from the 1906 issue, but that's a telltale sign that an artifact was manufactured and excavated in modern-day Turkey. Yes, Your Honor. But that's, you know, I repeat myself, but that's not sufficient that the key in this case, the ownership in this case, is solely based on whether it came out before 1906 or not and or whether it was excavated in some other country. That's the key to knowing about ownership here. And the problem is that these cases generally arise out of theft in a clandestine operation. Is there another case where it's a foreign state claiming ownership in a circumstance like this? Because I think you're right. The other cases all involve things where it's pretty clear that something was stolen. Here there is an issue as to whether it was stolen. Exactly, Your Honor. Even the Lydian Horde case, there were eyewitnesses that were clearly aware of what had happened, and that was put into evidence. But in a case like this, where there's no eyewitness, where there's no apprehension of the thief, which is generally the case, it's the norm, not the exception, these are clandestine operations conducted in the dark of night, and no one knows about them. So Anterkey did not know about the origins of this. I probably would have ignored it but for this case, but I think there was an article yesterday about a Met trustee having some items of shady provenance in her home. Yes, Shelby White, Your Honor. But I'd just like to add that with respect to the burden, I think it's clear from the record that the court never even looked at the issue of whether Turkey made a threshold burden, and thus did not even look at the issue. What about the opinion on the state, and she says an initial burden is still a burden. Why isn't that sufficient to address that point? But during the trial, Your Honor, the court below did not determine whether initial burden had been met, the threshold burden, and thus it never considered whether the onerous burden of proving that the idol was not stolen shifted to Defendant Steinhardt. And I will say, Your Honor, that the circumstantial evidence, some of which I've mentioned, which includes the fact that Kleshman offered Mr. Martin one of several of these stolen objects, if not there are only 20 in the world, and sold two to other dealers in New York. And all of that circumstantial evidence, I believe, I submit- Would get it to a jury. Would satisfy the preponderance of the evidence standard as well, and Defendant Steinhardt would not have satisfied the burden even if the court had properly shifted it, because the only evidence in the record they produce is hypotheses and conjecture and speculation about Killia items generally, and nothing about this item. That sounds a lot like what Turkey produced. Both sides are really arguing circumstantial evidence, I think. I respectfully disagree, Your Honor. I believe that Turkey has substantial compelling circumstantial evidence, and that Defendant Steinhardt had no evidence, circumstantial or direct, about this idol and whether it was not stolen. They relied solely on expert hypotheses, speculation, and conjecture. Thank you. Thank you very, very much. Very interesting case. Well-reserved decision. That concludes today's argument. Can I mention one thing? Calendar? If there's any doubt about the rules of Guggenheim as applicable to this case, I respectfully suggest that the courts consider- Thank you. Certifying to New York, but I don't believe there is- Thank you very much.